## NORTHWEST AIRLINES, INC., Plaintiff,

v.

## AMERICAN AIRLINES, INC., Defendant.

Civ. No. 4–91–539.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 17, 1994.

Thomas W. Tinkham, William R. Stoeri, Stephen Paul Lucke, Craig D. Diviney, Christopher John Riley, Stacey M. Fuller, Edward Brian Magarian, Jeffrey G. McGuire, Dorsey & Whitney, Minneapolis, MN, for Northwest Airlines, Inc.

Janie S. Mayeron, Richard Alvin Kaplan, Julie Miriam Friedman, Daniel D. Hill, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, James W. Quinn, David W. Gar-

tenstein, Stephen D. Kahn, David B. Goldstein, Sabrina Shroff, Robert Stefanski, Weil Gotshal & Manges, New York City, Donald E. Herrmann, Kelly Hart & Hallman, Ft. Worth, TX, for American Airlines, Inc.

Douglas A. Kelley, Steven Eugene Wolter, Kelley Law Office, Minneapolis, MN, for Laura H. Liu.

## ORDER

DIANA E. MURPHY, Circuit Judge, Sitting by Designation.

Plaintiff Northwest Airlines, Inc., (Northwest) appeals from portions of an order issued on August 24, 1994 by United States Magistrate Judge Jonathan Lebedoff related to discovery and to the pleadings.[1] Northwest appeals decisions compelling it to make expert witness Dr. Peter Belobaba available for further deposition testimony, assessing sanctions against it, and permitting defendant American Airlines, Inc. (American) to amend its pleadings to seek punitive damages. The standard of review under 28 U.S.C. § 636(b)(1)(a) is whether the magistrate's order is clearly erroneous or contrary to law. After a thorough review of the record, including affidavits and deposition testimony and legal arguments, the court concludes that the order should be affirmed in part and reversed in part.

## I.

On February 4, 1994 Magistrate Judge Lebedoff granted in part a motion by American to compel Northwest to produce Dr. Belobaba for deposition, providing that American could "depose Dr. Belobaba as an expert witness," but not as a fact witness. The magistrate judge's order did not discuss the nature of the distinction or elaborate on what was permissible to explore or where the dividing line should be drawn.

In April 1994 Dr. Belobaba's deposition was taken. Counsel for Northwest objected to some of the questioning and instructed the witness not to answer on the grounds that it called for fact testimony and was beyond the scope of the opinion for which the expert was to be used. Counsel for Northwest stated that Belobaba's affidavits were offered for his limited expert opinion that the elements American claims as proprietary can be found in the public literature on yield management.

American moved for sanctions, and on August 24 the magistrate judge granted its motion to compel further deposition testimony and to pay related costs, including those of Dr. Belobaba and the fees and expenses of American's counsel. The order also specified the subjects on which inquiry could be made.[2] Northwest appeals all aspects, arguing that its objections were consistent with the February 4 order and that in no event did its counsel's conduct merit sanctions.

Belobaba had stated in affidavits submitted by Northwest in support of its first motion for partial summary judgment that the five elements identified by American as a trade secret are "known techniques in the area of demand forecasting and can be found in the public domain." Belobaba aff., July 12, 1993, ¶ 4. He further stated that "[t]he American yield management system (like other airline yield management systems) consists of many different but related components"; that "[w]hile Northwest uses exponential smoothing in its demand forecasting, it does not do so in the way that American does"; and that the five elements are "readily available from sources other than American, including publicly available information." Belobaba supplemental aff., Aug. 5, 1993, ¶¶ 4, 5, 6. Belobaba also stated that in 1988,

---

1. Subsequent to the order this case was consolidated with *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, Civ. no. 4–93–1104.

2. The order provided that:

   Dr. Belobaba shall be allowed to answer all questions on the following subjects:
   a) publications Dr. Belobaba has written since the mid 1980s, including articles and presentations on the subject of airline demand forecasting and yield management; and
   b) the state of the knowledge in the airline industry of demand forecasting and yield management models, as reflected in the systems of airlines and third parties known to Dr. Belobaba including, without limitation, the Northwest system as it existed in the period of 1987 to 1991;

   Order, Aug. 24, 1994, at 23.

while he was involved with a Northwest research project, he recommended that it utilize maximum demand forecasting in yield management. Belobaba aff., July 14, 1993, ¶ 8.

At the deposition counsel for American asked several questions about Belobaba's knowledge of the public literature in yield management but focused largely on his demand forecasting experience. Counsel for Northwest permitted him to discuss his knowledge of the public literature, his academic presentations, and his work in forecasting maximum demand at Northwest. Northwest's counsel objected to questions about details of his yield management projects for airlines other than Northwest, whether Northwest's prior system contained the elements American alleges comprise a trade secret, whether he had suggested to Northwest that it incorporate those features, and whether he used the concept of maximum demand forecasting in his own work. It also objected to questioning about a 1985 report prepared by Belobaba.

The magistrate's order of August 24 setting the scope of the permissible inquiry goes beyond the limited subject matter for which Northwest now offers Dr. Belobaba's opinion, but American has the right to test the basis of his expertise, his understanding of the subject matter discussed in the literature, and his statements already on the record. This court interprets the magistrate's order to permit this, but not to extend into the details of his work for other airlines or to convert him into a fact witness. With this understanding the order relating to Dr. Belobaba's testimony should be affirmed.

■ A separate question is presented in respect to sanctions, however. Dr. Belobaba testified extensively at the deposition, and some of Northwest's objections were meritorious. Although Northwest took an overly restrictive view of the range of questioning permitted under the magistrate judge's February 4, 1994 order, counsel's conduct at the deposition was not such as to merit sanctions. The line between fact and expert testimony is not always clear and had not been elaborated on in the February 4 order. When Northwest's objections at the deposition are examined in light of the record it is apparent that they were based on a good faith interpretation of the magistrate's order. Sanctions are therefore inappropriate, and that portion of the August 24 order should be reversed.

## II.

The magistrate judge granted the motion of American for leave to amend the pleadings to seek punitive damages on its claims for misappropriation of trade secrets under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.03, and for tortious interference with employee confidentiality. He denied the motion with respect to American's claim that Northwest tortiously interfered with the at-will contracts between American and its employees. Northwest appeals those portions of the order granting the motion; American has not appealed that portion denying its motion.

■ Minnesota law allows punitive damages in a civil suit "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn.Stat. § 549.20.[3] A party seeking punitive damages may not request them in its pleadings, but must file a motion for leave to amend the pleadings to assert such a claim. The motion will only be granted if it is supported by prima facie clear and convincing evidence that the defendant engaged in conduct demonstrating deliberate disregard for the rights of others.[4] Minn.Stat. § 549.191. To deter-

---

3. Minn.Stat. § 549.20, subd. 1(b) states that:
   A defendant has acted with deliberate disregard for the rights of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and: (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
   (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

4. The Minnesota Uniform Trade Secrets Act, Minn.Stat. § 325C.03 provides that a court may

mine if plaintiff has made the proper showing, the evidence in support of the motion should be thoroughly examined, without considering evidence submitted in opposition. *Swanlund v. Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Mn.Ct.App.1990) (court should consider evidence proffered by plaintiff, "without cross-examination or other challenge").

■ With respect to the misappropriation claim, the evidence submitted by American indicates that Northwest acquired information which American considers proprietary in at least two instances. Ben Baldanza, Northwest's managing director and former manager of American's yield management operations, telephoned American employee Lisa O'Connell and asked her to send him American spill information. O'Connell dep. at 58–60, Richard Kaplan aff. ex. 18. O'Connell copied several tables onto a computer disk and mailed it to him; shortly thereafter she announced her resignation and went to work for Northwest. *Id.* Northwest also obtained information American considers proprietary through Laura Liu, a former American senior yield management analyst. Liu took a number of documents with her from American, including several which American alleges have detailed descriptions of its yield management system. Although Liu kept many of these documents at home, she took several to Barry Freedman, her supervisor at Northwest. It did not occur to Freedman to ask Liu whether the documents were confidential. Freedman dep. at 103–04, Kaplan aff. ex. 35.

Freedman instructed Northwest employees Marc Diamond and Chris van de Velde to analyze American's technology as reflected in the Liu documents. Freedman later requested that they refer to the American system as "A1" due to "sensitivity" within Northwest. Diamond dep. at 87, Kaplan aff. ex. 20. At Freedman's request, van de Velde also examined the documents with an eye toward developing a new demand forecasting

method for Northwest. The result was a "Demand Forecasting Rewrite Proposal" which included components American claims are proprietary. Northwest management approved the proposal, and it was implemented within months.

The evidence submitted by American could be interpreted to show that Ben Baldanza deliberately sought spill information from Lisa O'Connell.[5] As former manager of American's yield management operations he was familiar with spill tables and knew they were used extensively. Baldanza dep. at 59, Kaplan aff. ex. 17. His former position at American could also suggest he knew or should have known that American considered spill information to be proprietary, and that he wilfully engaged in misappropriation of that information.

American's view of the evidence indicates that Barry Freedman took possession of the Liu documents and quickly set Northwest employees to work analyzing them. He did not terminate the analysis when informed by Doug McKeen, Northwest's general counsel, of the existence of this lawsuit; instead, he instructed Diamond's and van de Velde's to refer to American as "A1" because of corporate "sensitivity." This evidence could establish wilful misappropriation in deliberate disregard for American's rights. *See* Minn.Stat. § 325C.03.

■ The evidence supporting American's demand for punitive damages on its claim of tortious interference with employee confidentiality is Baldanza's alleged request that O'Connell provide him with American spill information. This prima facie showing is sufficient to permit American to go forward on its claim for punitive damages. O'Connell's testimony, offered by American, indicates that Baldanza deliberately sought her out for spill information. As discussed above, Baldanza was familiar with spill tables and knew American used them extensively, and his former position at American could suggest he knew or should have known that

award exemplary damages if "willful and malicious appropriation exists."

5. Baldanza stated in deposition testimony offered by American that he did not recall exactly, but

thought that he had inadvertently taken the disk with him to Northwest. Baldanza dep. at 58–59, Kaplan aff. ex. 17.

American considered spill information to be proprietary. This makes out the requisite prima facie showing that Baldanza was aware that his actions were likely to violate American's right to employee confidentiality, and that he proceeded to seek the spill tables in deliberate disregard of that right. *See* Minn. Stat. § 549.20, subd. 1(b).

At this stage American should be permitted to go forward in its attempt to obtain punitive damages on its claims of misappropriation and tortious interference with employee confidentiality. Whether it will be able to make out the claims at trial is yet to be seen.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that the magistrate judge's August 24, 1994 order is reversed with respect to the imposition of sanctions and costs on Northwest Airlines, Inc., and is affirmed in all other respects.