Gary OLSON, Plaintiff,

v.

SNAP PRODUCTS, INC. and Sam
McInnis, Defendants.

No. Civ. 97–2437RHK/RLE.

United States District Court,
D. Minnesota.

Oct. 19, 1998.

Thomas R. Dolven, Denver, CO, Joel Rath, Edina, MN, for Plaintiff.

David R. Kelly, Minneapolis, MN, Kirk G. Warner, Raleigh, NC, and Christine N. Linblad, for Defendants.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Plaintiff's Motion to Amend Complaint to Add Punitive Damages Claim. A Hearing on the Motion was conducted on June 26, 1998, at which time, the Plaintiff appeared by Thomas R. Dolven and Joel Rath, Esqs., and the Defendants appeared by David R. Kelly, Kirk G. Warner, and Christine N. Linblad, Esqs.

For reasons which follow, the Motion to Amend is granted.

### II. *Factual and Procedural Background*

This action arises from an accidental explosion which occurred when the Plaintiff attempted to weld a tire rim, while the tire—filled with explosive gases—was still attached. Sometime before the explosion, the Plaintiff had injected the tire with a "fix a flat Non–Explosive Formula" tire inflator, which is an aerosol product that is manufactured by Defendant Snap Products, Inc. ("Snap"). Although the product was labeled "non-explosive," it contained the gaseous chemical compound, dimethyl ether ("DME"), as its propellant. The Plaintiff's welding torch caused the DME to ignite, and the resulting explosion injured him. He has filed suit against Defendants Snap, and Sam McInnis ("McInnis"), who is Snap's President and owner, for unlawful trade practices, for negligent misrepresentation, and for strict products liability.

In considering the Plaintiff's Motion to Amend under the laws of Minnesota, see, *Minnesota Statutes Sections 549.191, 549.20*, we have considered the materials which the Plaintiff has proffered as *prima facie* evidence of the Defendants' "deliberate disregard for the rights or safety of others." As required, the facts are recounted from a fair reading of the Plaintiff's version of the evidence.

The Defendants' involvement with aerosol tire inflators dates back to 1979, when Snap—then named Nationwide Industries, Inc. ("Nationwide")—began marketing a product labeled "Snap fix a flat." *Deposition of Sam McInnis* at 8–9, *Lyon v. Snap*, No. 96–D–2055 (D.Colo.); Pl.'s Ex. A. McInnis became familiar with the product in 1990, when he started working for the company as a sales manager. *Id.* at 7–8. During the Summer of 1994, McInnis assumed control of Snap's daily operations, and he and a partner purchased the company in April of 1995. *Id.* at 12–13.

The fix a flat inflator has proven to be one of Snap's biggest money-makers. Out of the approximately 70 products that the company manufactures, fix a flat accounts for a little less than half of Snap's business. *Id.* at 14. It has been prominent among Snap's line of products since at least 1990, when McInnis came to work for Snap. *Id.* at 36.

During its historical development, the fix a flat inflator has not always had the same chemical formulation. Due to safety concerns over its explosiveness, as well as its effect upon the environment, three separate generations of the inflator have been developed by Nationwide and Snap. During the 1980's, Nationwide marketed a "fix a flat" aerosol tire inflator that employed a flammable mixture of butane, and propane, as its propellant. *Id.* at 40. A number of lawsuits were filed against Nationwide, stemming from tire rim welding explosions that occurred when consumers attempted to weld tire rims on which tires, that were filled with the first generation of fix a flat, were still mounted. *Nationwide's Answer to Interrogatory No. 70, Urban v. Nationwide Indus., Inc.*, 92 CV 10365 (E.D.Mich.), Pl.'s Ex. B.

In 1989, Nationwide employed several measures to respond to the growing concerns over the safety of the fix a flat inflator. First, Nationwide started to relabel its first generation product as "HIGHLY FLAMMABLE," or "EXTREMELY FLAMMABLE," with a warning sticker that could be removed from the can of fix a flat and transferred to the tire itself, in order that anyone, who would come into contact with the tire, would be forewarned of its contents. *Letter from Townsend to Moore of 11/14/89*, Pl.'s Ex. C; *Substantial Product Hazard Report* at 6, Pl.'s Ex. D; *Photograph of First Generation*

*Labeling,* Pl.'s Ex. E. Nationwide also disseminated a safety bulletin to tire repair shops, welding shops, and several trade organizations, which warned them of the risks associated with the first generation inflator. *Substantial Product Hazard Report* at 6.

Most significant among the safety measures that Snap effected was the development of the second generation "fix a flat" inflator that was "non-flammable." This inflator was heralded as the first non-flammable tire inflator that did not rely upon chlorofluoro-carbons ("CFC's"), which have the adverse effect of depleting the Earth's ozone layer, but employed, instead, hydrochloro-fluoro-carbons ("HCFC's"), which are recognized to be less deleterious to the ozone layer. *Letter from Townsend to Moore* at 2; *Substantial Product Hazard Report* at 6.

By 1990, production of the second generation inflator was in full swing. In the meantime, McInnis learned that the Federal Consumer Product Safety Commission ("CPSC") had informed Nationwide that it was considering the promulgation of a regulation which would completely ban the manufacture of tire inflators that employed butane and propane propellants. Nationwide, apparently confident of the safety and competitiveness of its new inflator, encouraged the CPSC to issue that ban. *McInnis Depo.* at 282. Apparently, the butane- and propane-based inflators were not banned, but it became a standard practice in the industry to use the transferable, graphic warning labels as a means of warning tire repair professionals of the explosive hazards presented by rim welding. *Id.* at 103–04.

In 1991, the Defendants emphasized the safety gap, between the "non-flammable" second generation "fix a flat" and the competing tire inflators, as a sales pitch. In publications sent to automotive retailers, Nationwide touted the second generation technology, which employed "Dupont's latest generation of non-flammable HCFC propellant, Dymel 22, instead of highly flammable propane/isobutane/butane gases." *News Release of 6/20/91,* Pl.'s Ex. F. Nationwide instructed its sales representatives to emphasize the differences, between the non-flammable second generation fix a flat and the products of its competitors, by asking the buyer: "Do they really want a product with that kind of warning label sitting on their shelves? *** or in their spouses [sic] car?" *Memo, from Barron/Smith to Nationwide Sales Representatives of 7/12/91,* Pl.'s Ex. G. In another memorandum to its sales representatives, McInnis instructed them to highlight that a competitor's aerosol flat tire product exhibited flammability in recent tests, while the fix a flat "passed a rigid par calorimeter bomb test ***." *Memo. from McInnis to Sales Representatives of 12/18/91,* Pl.'s Ex. J.

In pressing their competitive safety advantage over competitors, the Defendants extolled the risks created when repair personnel weld on tire rims, not suspecting that the tires, which were mounted on the rims, were filled with explosive gases. In particular, Snap focused its comparison attacks on "STP Flat Fixer," a competing product that used DME as a propellant, and that was marketed, like Snap's fix a flat, as "non-explosive." Several years earlier, a Nationwide researcher had looked into the viability of DME as a propellant, but had recommended that it not be used in a non-flammable tire inflator formula. *Memo, from Norman to Lehman of 12/14/88,* Pl.'s Ex. BB. On March 5, 1992, Jim Harless ("Harless"), who is Nationwide's Vice President of Operations, issued a memorandum to its sales representatives comparing fix a flat with the STP Flat Fixer. *Memo. from Harless to Sales Representatives of 3/5/92,* Pl.'s Ex. L. The memorandum excoriated STP for labeling its product "non-explosive," even though the potential for an explosion existed during tire rim welding:

> [Testing indicates] that if the tire containing STP Flat Fixer is not removed from the rim during repair, the potential for explosion still exists. This hazard is compounded by labeling this product "non-explosive" which may lead some mechanics to disregard the need to remove the tire from the rim. Apparently, STP is aware of the potential for this hazard as indicated by the warning on the can: "For maximum safety, repair only after carefully deflating and removing the tire from the rim. Deflate tire in well-vented areas away from open flames or sparks."

*Id.* at 1.

By comparison, Snap's fix a flat fared better in identical testing, causing Harless to con-

clude that the fix a flat "[wa]s superior with regard to safety." *Id.* at 2.

Harless also described the fix a flat's advantage in the "flame extension test," in which an aerosol product is sprayed into a candle so as to create a blow torch effect, and the length of the resulting flame is measured. According to the memorandum, STP had claimed that its product had passed the aerosol industry standard for flammability, because, when sprayed into a candle, the flame stretched less than 18 inches long. *Id.* Harless thought that the industry standard of 18 inches should not be used for tire inflators, when the contents of the aerosol can are not dispersed into the atmosphere, but are compressed into a tire. He proceeded to criticize the fallacy of STP's decision to label its product as "non-explosive," when the product created a 3 to 16 inch flame on the flame extension test, and its key ingredient—DME—was defined, by the Condensed Chemical Dictionary, as "highly flammable and a dangerous fire and explosion hazard ***." *Id.* at 2. As the second generation fix a flat did not use DME, but employed the HCFC technology, Harless concluded that it was "the superior formulation in providing an effective, *safe*, non-flammable emergency tire repair system." *Id.* at 3–4 [emphasis in original]. Attached to the Harless memorandum, which was routed to Nationwide's sales representatives, was a memorandum from McInnis, that instructed the representatives to "[r]ead Jim Harless' memo carefully" so as to be able to properly respond to customer inquiries. *Memo. from McInnis to Sales Representatives of 3/5/92*, Pl.'s Ex. K.

In 1993, the Clean Air Act was amended in order to ban the sale of aerosol products containing HCFC's, because of their harmful effect upon the ozone layer. See, *Title 42 U.S.C. § 7671i(d)(1)(A)*. As a consequence, Snap was required to develop a third generation fix a flat product. *McInnis Depo.* at 147–56. In its patent application, the inventors of the third generation inflator represented that there were no non-flammable propellants available on the market, which did not have significant environmental shortcomings. *U.S. Patent Application of 1/19/94* at 2, Pl.'s Ex. AA. The inventors stated that the DME technology, which they proposed to employ, was not as flammable as propane

and butane, and therefore, constituted "an optimum choice between the non-flammable (but unavailable) propellants and the extremely flammable (generally used) propellants for tire sealing and inflating aerosols." *Id.* The new fix a flat inflator, which was placed on the market in late 1993, or early 1994, utilized DME as its propellant. *McInnis Depo.* at 40–42.

Although the Defendants had earlier criticized a competitor's labeling of a DME-based inflator as "non-explosive," Snap labeled its third generation product as the "NEW fix a flat NON–EXPLOSIVE FORMULA." *Photograph of Third Generation Labeling*, Pl.'s Ex. O. McInnis has testified that it was his decision to label the inflator as such. *McInnis Depo.* at 77. At the bottom of the front of the aerosol can is the warning:

CAUTION: CONTENTS UNDER PRESSURE. READ ALL CAUTIONS AND DIRECTIONS ON BACK PANEL BEFORE USING.

*Photograph of Third Generation Labeling.*

Among the instructions listed on the back of the can, in relatively fine print, is the following directive:

Never weld on tire rims.

*Id.*

The directive contains no further explanation of its basis—notwithstanding the emboldened heralding of the product, as "NON–EXPLOSIVE" on the front of the product. Contemporaneous to the third generation's debut, McInnis learned that the STP inflator, which also employed DME, and which was labeled "non-explosive," had been recalled from the market "because of a safety issue with regard to tire repair professionals." *McInnis Depo.* at 399–400.

In the Spring of 1994, soon after Snap began marketing its DME-based, third generation tire inflator, Jim Wells ("Wells"), who was the Vice President of Chemical Operations of Radiator Specialty Company, expressed concern to McInnis about the safety of Snap's new product. *Id.* at 443–45. In particular, Wells objected to Snap's decision to use the "non-explosive formula" label. *Id.* In a letter that followed a number of conver-

sations which concerned the matter, Wells wrote:

Your product contains dimethyl ether (DME) which is an extremely flammable gas. We have tested your product in our laboratory and have also had it tested by outside facilities. Testing per Federal Hazardous Substance Act (FHSA) parameters, generated a flame extension in excess of 18 inches as well as a flash back to the valve. Further, we have had your product inserted into a tire and introduced an ignition source exterior to the tire. That resulted in a violent explosion.

\* \* \* \* \* \*

It is our opinion that under the FHSA, your product should be labeled "DANGER: Extremely flammable" or, at least, "CAUTION: Flammable." In the absence of either of those mandatory writings, we believe that your product is misbranded.

\* \* \* \* \* \*

While clearly we are competitors in this product category, our immediate concern, and I am sure, your's [sic] as well, is the public's safety. \*\*\*

*Letter from Wells to McInnis of 3/22/94*, Pl.'s Ex. P.

Soon after McInnis received this letter, he met with Wells, and another Radiator Specialty Company representative, in order to discuss their concerns. According to Wells' notes from that meeting, he confronted McInnis with their testing results, and McInnis responded that his people "had assured him repeatedly" that the product would not cause tire explosions, although he conceded that he was in the process of obtaining further testing of the product. *Wells' Notes of 3/31/94* at 2, Pl.'s Ex. Q. The notes also reflect that McInnis expressed the view that a product recall "could cost millions of dollars; could cost him his job \*\*\* and could put SNAP out of business." *Id.* Finally, Wells' notes reflect, in the following excerpts, that McInnis would approach Snap's Board of Directors so as to discuss a possible product recall:

15. Sam said "as I told you last week, if there is any danger to the public, I will recall the product" and "I still have the authority and can do that if needed."

16. Sam will go to the Bishop board and make his case, whatever it turns out to be. He said they told him it must be SAFE. To that end, they carry a $25,000,000 insurance policy.

*Id.* at 4.

Shortly after the meeting, two of Snap's attorneys wrote to the President of Radiator Specialty Company, Alan Blumenthal, rejecting any suggestion that the third generation fix a flat should be labeled as "flammable," and threatening legal action against the company for any future disparagement of Snap's product. See, *Letter from Jenkins to Blumenthal of 4/11/98*, Pl.'s Ex. R; *Letter from Nanney to Blumenthal of 4/13/98*, Pl.'s Ex. S.

Despite the outward hazard denials of Snap's attorneys, internally, Snap recognized the danger posed by the third generation fix a flat inflator. In an in-house, company memorandum, McInnis wrote:

Recent allegations of product safety on Fix–A–Flat by Radiator Specialty have led me to conduct my own investigation. I, too, have concluded that the product is possibly unsafe and has the potential to cause bodily harm or death to an unsuspecting tire repair professional or consumer through misuse. The problem is twofold:

(1) Labeling: The new formula will support a flame extension of more than 23″ when held 5″ to 6″ away from a candle. This is in "as is" condition with the hose intact. The product also fails the alternative drum test established by the Chemical Manufactures [sic] Association (CSMA).

(2) Explosive: Product evacuated into a large diameter ball under pressure will erupt into a massive fireball when exposed to an ignition source. The experiment exposed the samples to an ignition source in both the liquid and vapor phase of the product. Both are volatile.

*Memo. from McInnis to Ketchledge and Johnson of 4/11/94*, Pl.'s Ex. T.

The memorandum reported that the CPSC had initiated an investigation into Snap's labeling of its product as "non-explosive," and cautioned that, if a problem exists, "I think each of you realize the consequences." *Id.*

Snap procured additional tests in order to determine the appropriateness of the "NON–EXPLOSIVE FORMULA" label. DustTech, an engineering firm, evaluated the inflator, and concluded as follows: "Use of the [third generation] formulation for inflation of tires is conceptually similar to the use of propane for the same purposes, as regards fire/explosion considerations." *Flammability Limits of Inflator Gas Mixture Report* at 3, Pl.'s Ex. 3; *McInnis Depo.* 395–98. The Defendants also consulted with Paul Hughett ("Hughett"), and Safety Consulting Engineers, Inc., in order to perform tests that would be designed to determine the effect of introducing an external ignition source to tires that had been inflated with fix a flat. *Tire Gas Flammability Tests Report,* Pl.'s Ex. V. The results of the experiments—depending upon variables such as quantity of inflator introduced into the tires, tire pressure, the amount of air in the tire, and the number of times an ignition spark was produced—ranged from no reaction in the tire, to an explosion that sent the tire to a height of 252 feet in the air. *Id.* Similar tests, which were conducted, in April or May of 1994, by Reece Howell, who was a chemical engineer, so as to simulate rim welding, also produced explosions. *McInnis Depo.* at 472.

An aerosol industry consultant, Montfort Johnsen ("Johnsen"), tested the fix a flat for flammability, and found that, according to the official test for determining aerosol flammability—the flame extension test—fix a flat was not flammable, and did not require precautionary labeling. *Letter from Johnsen to Ketchledge of 4/21/94,* Pl.'s Ex. X. He observed that the flame extension test was "largely irrelevant for *** tire inflators," because "the products are designed, not to be dispersed into the air, but directly into a hermeticaly [sic] sealed tire cavity." *Id.* at 2. Nevertheless, Johnsen believed that, if the aerosol dispenser was used as prescribed on its label, "there is no possibility of harm to the consumer or repairman." *Id.* at 2–3.

In 1996, Snap was sued twice for injuries that resulted from tire explosions during rim welding, thereby implicating the third generation DME-based fix a flat aerosol inflator as a potential explosion hazard. McInnis became aware of one of these actions in early 1996. *McInnis Depo.* at 537–39. The lawsuit did not prompt McInnis to consider a recall of fix a flat, or to investigate a modification of the product's label. *Id.* at 539.

On October 1, 1996, the Plaintiff was injured when a tire, which contained the third generation fix a flat, exploded as he was welding a tire rim. In his deposition, the Plaintiff admitted that he did not read the back of the fix a flat aerosol can, which instructed users not to weld on tire rims, because he had seen the front label's pronouncement that the product employed a "NON–EXPLOSIVE FORMULA." *Deposition of Gary Olson* at 176, Def.'s Ex. 14.[1]

---

1. Although the Plaintiff's deposition testimony was not submitted by him as *prima facie* evidence in support of his Motion, we nonetheless consider it. We do so with full recognition of the case authority which states that, in applying the provisions of Minnesota Statutes Section 549.191, the Court should examine the evidence in support of a punitive damages claim, without considering the evidence submitted in opposition to the claim. *Northwest Airlines, Inc. v. American Airlines, Inc.,* 870 F.Supp. 1499, 1502–03 (D.Minn.1994); *Swanlund v. Shimano Indus.,* 459 N.W.2d 151, 154 (Minn.App.1990) (proffered evidence should be considered "without cross-examination or other challenge."). At the same time, the Minnesota Supreme Court commands the Courts, which consider such a Motion, to "do more than 'rubber stamp' the allegations in the motion papers," for they "must ascertain whether there exists prima facie evidence that the defendants acted with 'willful indifference.'" *Shetka v. Kueppers, Kueppers, Von Feldt and Salmen,* 454 N.W.2d 916, 918 n. 1 (Minn.1990).

Here, one could not have a fair appraisal of the Plaintiff's *prima facie* case without a review of his own, pertinent recollection of how the labeling of the Defendants' product affected his decision to proceed with the welding. We seriously doubt that our role could be anything but that of a "rubber stamp" were we to allow the Plaintiff to exclude his own personal testimony from our consideration, simply because he has chosen not to submit the evidence for our review.

We have not, however, considered the other evidence, which the Defendants have submitted, and which attempts to rebut, or impeach, the Plaintiff's proffered *prima facie* showing. To actually weigh the credibility, or the probative weight, of the competing contentions would result in far more than a searching inquiry of the Plaintiff's *prima facie* evidence. In ruling upon the propriety of a claim for punitive damages, Court does not act as factfinder, but only determines whether the Plaintiff's evidence, *if unrebutted,* would support an award of punitive dam-

The Plaintiff's expert has opined that the explosion was caused by the Plaintiff's welding, which ignited the DME propellant in the fix a flat. *Affidavit of Donald J. Myronuk* ¶ 3, Pl.'s Ex. Y. Another expert tested Snap's third generation product, and determined that the propellant is almost solely made of DME, and that it exhibits the similar properties of flammability and explosiveness as a competitor's inflator product, which is labeled as "extremely flammable," and as "containing explosive gas." *Affidavit of W. Ronald Gentry* ¶ 4–5, Pl.'s Ex. Z. The expert also concludes that the third generation product is sufficiently volatile to require at least a label of "flammable," according to the CPSC's labeling requirements. *Id.* ¶ 8.

### III. *Discussion*

■ 1. *Standard of Review.* "In the Federal Courts of this District, the pleading of a punitive damage claim, under causes of action premised upon the Laws of the State of Minnesota, must generally conform to the requisites of Minnesota Statutes Sections 549.191 and 549.20." *Ulrich v. City of Crosby,* 848 F.Supp. 861, 866 (D.Minn.1994); see also, *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d 1244, 1256 (8th Cir.1994), cert. denied, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995); *Northwest Airlines v. American Airlines,* 870 F.Supp. 1499, 1502 (D.Minn.1994); *Security Savings Bank v. Green Tree Acceptance, Inc.,* 739 F.Supp. 1342, 1352 (D.Minn.1990); *Kuehn v. Shelcore, Inc.,* 686 F.Supp. 233 (D.Minn.1988); *Fournier v. Marigold Foods, Inc.,* 678 F.Supp. 1420, 1422 (D.Minn.1988). "As recognized by our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to address a perceived insurance crisis." *Ulrich v. City of Crosby,* supra at 866–67, citing *Gobuty v. Kavanagh,* 795 F.Supp. 281, 287 (D.Minn. 1992); *Kuehn v. Shelcore, Inc.,* supra at 234; *Filz v. Mayo Foundation,* 136 F.R.D. 165, 174 (D.Minn.1991).

■ Under Section 549.191, a plaintiff who seeks to assert a punitive damage claim must first obtain the leave of the Court to do so, based upon a *prima facie* showing of entitlement. *Ulrich v. City of Crosby,* supra at 867. "The plaintiff is not required to demonstrate an entitlement to punitive damages *per se,* but only an entitlement to allege such damages." *Id.,* citing *Fournier v. Marigold Foods, Inc.,* supra; *McKenzie v. Northern States Power Co.,* 440 N.W.2d 183, 184 (Minn.App.1989). As Section 549.191 makes clear, "if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages." *Minnesota Statutes Section 549.191.* "The Minnesota Courts have determined that '[p]rima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor.'" *Ulrich v. City of Crosby,* supra at 867, quoting *Swanlund v. Shimano Indus. Corp., Ltd.,* 459 N.W.2d 151, 154 (Minn.App.1990), rev. denied (Minn., October 5, 1990); *McKenzie v. Northern States Power Co.,* supra. "The same Courts have also noted that 'prima facie' does not refer to a quantum of evidence but, rather, to a procedure for the winnowing of nonmeritorious punitive damage claims." *Id.*

■ Under the strictures of Section 549.191, "the Court reviews the evidence in support of a Motion to Amend as the Court would review a Motion for a Directed Verdict—now denominated in the Federal Rules of Civil Procedure as a Motion for the Entry of Judgment as a matter of law." *Id.;* see also, *Rule 50(a), Federal Rules of Civil Procedure; Swanlund v. Shimano Indus, Corp., Ltd.,* supra ("Minn.Stat. § 549.191 essentially requires the trial court to direct a portion of the verdict against the plaintiff if the evidence of willful indifference is insufficient."). "Thus, in reaching such a determination, the Court makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof." *Id.; Swanlund v. Shimano Indus. Corp., Ltd.,* supra.

---

ages in his favor. See, *Ulrich v. City of Crosby,* 848 F.Supp. 861, 867 (D.Minn.1994), quoting *Swanlund v. Shimano Indus. Corp., Ltd.,* 459

N.W.2d 151, 154 (Minn.App.1990), rev. denied (Minn., October 5, 1990). This is the standard we have employed.

■ Furthermore, "in evaluating the existence of a *prima facie* showing for the assertion of a claim for punitive damages, the Court must recognize that 'punitive damages do not 'belong' to the plaintiff in the same sense as compensatory damages.'" *Ulrich v. City of Crosby,* supra at 867, quoting *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 837 (Minn.1988), cert. denied, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). As we noted in *Ulrich:*

> Punitive damages are intended to punish a defendant, or to make an example of a defendant's wrongdoing, and not to compensate the plaintiff who has already been compensated. As a consequence, punitive damages may only be awarded when a defendant's conduct reaches a threshold level of culpability.

*Id.* at 867.

■ Accordingly, "[a] mere showing of negligence is not sufficient; instead, the conduct must be done with malicious, willful, or reckless disregard for the rights of others." *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 268 (Minn.1992).

As amended in 1986, Minnesota Statutes Section 549.20 provided, in pertinent part:

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

*Id.*

The term "willful indifference" has not been statutorily defined but, in *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381 (Minn.1990), the Minnesota Supreme Court provided the following insight:

> Willful indifference is not equivalent to common law malice in a defamation action.

Common law malice in this context has been defined as making the statement "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *** Willful indifference does not imply a purpose of actually intending to harm the plaintiff, but a knowing disregard of the plaintiff's rights or safety.

*Id.,* see also, *Mrozka v. Archdiocese of St. Paul and Minneapolis,* 482 N.W.2d 806, 812 (Minn.App.1992), rev. denied (Minn., May 15, 1992).

"As a consequence, the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive damages." *Ulrich v. City of Crosby,* supra at 868, citing *Wirig v. Kinney Shoe Corp.,* supra at 381; *Herbst v. Northern States Power Co.,* 432 N.W.2d 463, 469 (Minn.App.1988), rev. denied (Minn., February 10, 1989); *State by Woyke v. Tonka Corp.,* 420 N.W.2d 624, 629 (Minn. App.1988), rev. denied (Minn., May 4, 1988); and *Utecht v. Shopko Dept. Store,* 324 N.W.2d 652, 654 (Minn.1982).

Subsequently, in 1990, the Minnesota Legislature amended Section 549.20, by replacing the phrase "willful indifference" with "deliberate disregard." [2] This substitution of terminology became effective on May 4, 1990, so as to require the application of the "deliberate disregard" terminology to causes of action that should arise after that date. *Ulrich v. City of Crosby,* supra at 868. See, *1990 Minn.Laws, ch. 555, § 15, Subdivision 1(a), 1990 Minn.Laws 1557, 1563, codified at Minnesota Statutes Section 549.20, Subdivision 1(a) (1990).* The term "deliberate disregard" was comprehensively defined in the amended statute, as follows:

---

**2.** As amended, Section 549.20, Subdivision 1(a) reads as follows:

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

As we noted in *Ulrich v. City of Crosby,* 848 F.Supp. 861, 868 n. 6 (D.Minn.1994):

> Since the Minnesota Supreme Court had defined "willful indifference" as essentially amounting to a "knowing disregard," *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381

(Minn.1990), it remains unclear what substantive modification, if any, was effectuated by the 1990 Amendment to this Statute. We do note that, without much in the way of an explanation, the Minnesota Court of Appeals has characterized the new standard as a "heightened" one. See, *Bougie v. Sibley Manor, Inc.,* 504 N.W.2d 493, 500 n. 4 (Minn.App.1993); *Hanks v. Hubbard Broadcasting, Inc.,* 493 N.W.2d 302, 311 n. 3 (Minn.App.1992), rev. denied (Minn., February 12, 1993).

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

 (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

 (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

*Minnesota Statutes Section 549.20, Subdivision 1(b).*

Here, the conduct at issue occurred after May 4, 1990, and therefore, we are obliged to apply the "deliberate disregard" standard.

 As we explained in *Ulrich v. City of Crosby,* supra at 868, under the deliberate disregard standard, the Court is required to search for evidence which is "clear and convincing." "To be 'clear and convincing,' there must be 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.'" *Ulrich v. City of Crosby,* supra at 868, quoting *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). "Where the evidence is sufficient to permit the Jury to conclude that it is 'highly probable' that the defendant acted with deliberate disregard to the rights or safety of others, the 'clear and convincing' standard would be satisfied." *Id.,* citing *Becker v. Alloy Hardfacing & Engineering Co.,* 401 N.W.2d 655, 659 (Minn.1987); *Swanlund v. Shimano Indus. Corp., Ltd.,* supra.

 "In the final analysis, when presented with a Motion for leave to assert a punitive damage claim, the function of the Court is to do more than 'rubber stamp' the allegations in the Motion papers." *Ulrich v. City of Crosby,* supra at 868. "The Court must independently ascertain whether there exists *prima facie* evidence that the defendant acted with a deliberate disregard of the rights or safety of others." *Id.,* citing *Swanlund v. Shimano Indus. Corp., Ltd.,* supra; *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen,* 454 N.W.2d 916, 918 n. 1 (Minn.1990).

 B. *Legal Analysis.* Punitive damages are available against the manufacturer of a product that abuses its control over information about product risks in a manner that shows a disregard for public safety. *Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727, 733 (Minn.1980). The Record, which constitutes the Plaintiff's *prima facie* case, would amply support a reasonable Jury's conclusion that the Defendants deceptively labeled the third generation fix a flat tire inflator as the "NON–EXPLOSIVE FORMULA," in order to preserve their market advantage—even though they knew of the high probability of tire welding explosions—in deliberate disregard of the safety of consumers, and of tire repair professionals. See, *Minnesota Statutes Section 549.20, Subdivision 1(b).* Equally supportable, based upon the Plaintiff's showings, is a finding that the Defendants' conscious failure to change the deceptive label design, in the face of mounting evidence that the existing product labels had not adequately protected the public, was at least knowingly indifferent to the consuming public's safety.

On this Record, there can be little doubt that, at the time of that the third generation fix a flat inflator was introduced, and continuing up to the Plaintiff's injury, the Defendants were aware of the explosive propensities of DME. As early as 1988, Nationwide had considered, and rejected, the use of a DME-based "non-flammable" tire inflator. See, *Memo. from Norman to Lehman of 12/14/88.* More significantly, in promoting its preferred safety advantages over STP's inflator, which had employed DME as a propellant, the Defendants not only emphasized that DME was "highly flammable and a dangerous fire and explosion hazard," but assumed the stance that a DME-based inflator could cause explosions during rim welding— the precise activity which is at issue in this case. See, *Memo. from Harless to Sales Representatives of 3/5/92.* The evidence is clear and convincing that, by the time Snap's third generation inflator was placed in the market, the Defendants were fully aware of the danger of physical injury, or death, that DME posed to those exposed to its explosiveness.

The Defendants argue that the STP tire inflator, which used DME, was different from the product that they later manufactured.

Even though both employed DME as the propellant, STP's product was carbon dioxide-based, while Snap's third generation inflator "was primarily water based \*\*\*." *Def.'s Memo.* at 7. Citing *Lewy v. Remington Arms Co.,* 836 F.2d 1104 (8th Cir.1988), the Defendants insist that any evidence about the nature of STP's inflator is wholly irrelevant to the instant Motion. In *Lewy,* our Court of Appeals held that, for evidence of prior accidents involving another company's product to be admissible in showing that the defendant was aware of the danger, the circumstances surrounding the prior accidents must be substantially similar to those posed by the defendant's product. *Id.* at 1108–09. The Plaintiff's *prima facie* evidence does not disclose the significance of any formulaic differences between STP's product and Snap's third generation inflator. The Plaintiff has shown that both products use DME as a propellant, and that both cause tires to explode during rim welding activities. Necessarily, the ultimate admissibility of evidence about the hazards inherent in STP's product, and the Defendants' knowledge of those hazards, is a question reserved for the Trial setting, and will be resolved after a thorough vetting of a full Record, which is informed by both parties' submissions. For the purposes of the Motion before us, we view the Plaintiff's evidence without rebuttal and, in that framework, we conclude that the Defendants' prior position, that STP's use of DME as a propellant in a so-called "non-explosive" tire inflator was unreasonably dangerous, and was likely to result in explosions during rim welding, demonstrates a foreknowledge of the risks presented by Snap's new, DME-based, "non-explosive" tire inflator.

The Defendants' knowledge of the risk, especially in the tire rim welding context, became even more acute after the new fix a flat was placed in the marketplace. In fact, the inventors of the third generation fix a flat pointed out that, of the effective tire inflator propellants available, other than those that were environmentally unsound, all were flammable. *U.S. Patent Application of 1/19/94* at 2. Only a couple of months after the product was so introduced, the Defendants were confronted with testing evidence that tires, which were filled with fix a flat, and which were subjected to an internal ignition source,

exploded violently. *Letter from Wells to McInnis of 3/22/94.* McInnis, himself, recognized that the third generation product failed the flame extension, and the alternative drum tests for flammability and, when inflated into a pressurized container, and subjected to an external ignition source, would explode "into a massive fireball \*\*\*." *Memo. from McInnis to Ketchledge and Johnson of 4/11/94.* Experts, who were subsequently consulted for the purpose of investigating this hazard, confirmed McInnis' assessment of the danger.

Despite the Defendants' knowledge of their product's propensity to explode, they labeled it as the "NON–EXPLOSIVE FORMULA." Although the fine print, which was placed on the back of the product, and which was referenced from an instruction on the front of the can, advises consumers to "never weld on tire rims," nowhere on the fix a flat can is there any mention of the circumstances in which the product could explode. The Defendants' decision to label this product as using a "NON–EXPLOSIVE FORMULA," when they were acutely aware of the significant risk that the product would explode during tire repair, is sufficient to evince an indifference to the high probability of injury to others. Cf., *Hodder v. Goodyear Tire & Rubber Co.,* supra at 835–36 (holding that tire manufacturer's decision to downplay product's inherent explosiveness danger, by inadequately distributing safety information, may have exhibited willful indifference to the safety of others).

Quite obviously, the Defendants were capable of preventing injury to consumers by employing the transferable warning label design that they had pioneered in connection with their butane/propane-based first generation inflator, and which later became the industry standard. Instead, the Defendants used the "NON–EXPLOSIVE FORMULA" label. At the time of the Hearing, we queried defense counsel as to the meaning that the Defendants intended to convey to the consuming public by that terminology, but the responses given were oblique, at best. Beyond being false—which would be harmful enough—the use of the "NON–EXPLOSIVE" terminology induces a false sense of

reassurance which is particularly misleading, and dangerous. Of course, any ordinary, plain reading of this label would lead a user to believe that a tire inflated with the product would not explode, for it is non-explosive. Indeed, a Nationwide researcher, in describing the dangers associated with STP's competing DME-based inflator, wrote that, even though STP warned users to deflate the tire before welding, the explosion "hazard is compounded by labeling this product 'non-explosive' which may lead some mechanics to disregard the need to remove the tire from the rim." *Memo. from Harless to Sales Representatives of 3/5/92* at 1.

■ The Defendants continue to maintain that their label was appropriate because it complied with CPSC regulations, which employ a flame extension length as the determinate factor of explosiveness. The Record reveals, however, that the Defendants did not seriously consider the flame extension test to be a useful means of determining the explosiveness of an aerosol product that is inflated into a sealed container, as opposed to dispersed into the atmosphere. See, *id.* at 2 ("It is Nationwide's opinion that this is not a valid test for tire inflators which are used at one time and transferred into a closed vessel, rather than being sprayed intermittently into the air."); *Letter from Johnsen to Ketchledge of 4/21/94* at 2. Fix a flat's compliance with a test, which the Defendants knew did not provide a useful assessment of their product's level of safety, may ultimately be relevant to the issue of punitive damages, but does not preclude such an award as a matter of law. See, *Gryc v. Dayton–Hudson Corp.,* supra at 734–35 (in products liability action for injuries caused by flammable pajamas, manufacturer could not rely on fact that pajamas passed a forced ignition test, where that test was not determinative of whether clothing was unreasonably dangerous).

■ The Defendants contend that their product contained adequate consumer safety warnings because the aerosol can specifically warned users to "Never weld on tire rims." This warning, unexplained and tucked, in fine print on the back of the can, does not adequately remedy the deception fostered by the assurance of a "NON–EXPLOSIVE FORMULA," which was boldly emblazoned across the face of the product. As we have noted, the pledge of nonexplosiveness disarms the consumer from the sense of caution, and precaution, that forthright labeling would forcefully instill. As the Plaintiff's welding activity, and the resultant explosion, were plainly foreseeable, the Defendant's decision to submerse the pertinent warning in a pool of fine print on the obverse side of an assurance of nonexplosiveness, clearly and convincingly persuades us that the deliberateness of the Defendants' ostensible disregard of the public's, and the Plaintiff's well-being is an issue for the Jury's deliberation.[3]

Even more condemning, however, is the fact that, in early 1994, Snap was confronted with laboratory evidence that tires, which were inflated with fix a flat, were explosive, and were unreasonably dangerous for a foreseeable use. The Defendants' response to this prospect of public hazard may be fairly characterized, at least on this Record, as consisting of inward recognition, outward abnegation and, at bottom, woeful inaction. While Snap continued to market, and to label, its product as "NON–EXPLOSIVE," and while its attorneys spurned the safety concerns of one of Snap's critics, and threatened the critic with a lawsuit, McInnis recognized that the product "has the potential to cause bodily harm or death to an unsuspecting tire repair professional or consumer through misuse." *Memo. from McInnis to Ketchledge and Johnson.* Even a 1995 law-

---

**3.** Without belaboring the point, we can find no purpose to the Defendants' employment of the "NON–EXPLOSIVE" designation apart from its obvious benefit as a marketing tool. We believe that a Jury should properly consider whether the employment of that terminology, when coupled with a diminished caveat on the back of the can, was intended to protect the consuming public, or to assure that the consumer would not question the apparent contradiction between a product which is labeled as nonexplosive, but which is not intended for use in proximity to tire rim welding. If the use of the "NON–EXPLOSIVE" designation had been asterisked, on the front of the can, with an advisory that the product should not be exposed to a flame, such as encountered in tire rim welding, we seriously doubt that the market for the product would have been distinguishable from other products in the industry—a prospect that, the Record reflects, the Defendants sought to avoid.

suit, which arose from a tire rim explosion, could not convince the Defendants to alter, or to modify, their label design.

The law requires more. In considering the various instructions, and warnings, to be placed on the fix a flat product, the Defendants were responsible for taking adequate measures to minimize the hazards associated with foreseeable misuse. See, *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 925 (Minn.1986). In doing so, the Defendants were "obligated to exercise that degree of care in [the] plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in *** an unintended yet reasonably foreseeable use." *Holm v. Sponco*, 324 N.W.2d 207, 212 (Minn.1982), quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571, 577–78 (N.Y.1976).

Conceding, for argument's sake, that they breached this duty of care, the Defendants urge that, under *Beniek v. Textron, Inc.*, 479 N.W.2d 719, 723 (Minn.App.1992), rev. denied (Minn., Feb. 19, 27, 1992), and *Lundman v. McKown*, 530 N.W.2d 807, 817 (Minn.App. 1995), rev. denied, (Minn., May 31, 1995), cert. denied, 516 U.S. 1092, 116 S.Ct. 814, 133 L.Ed.2d 759 (1996) and 516 U.S. 1099, 116 S.Ct. 828, 133 L.Ed.2d 770 (1996), the mere knowledge of the existence of a risk, and the failure to take adequate steps to prevent harm, is insufficient to support a finding that they acted with deliberate disregard for the rights or safety of others. *Lundman* involved a religious organization's "good faith" advocacy of spiritual healing, despite knowledge of a child's serious illness and, therefore, it provides little guidance in this context—where the pertinent decisions are not motivated by religious tenets, but competitive economics. In *Beniek*, a plaintiff brought an action against a chain saw manufacturer for injuries suffered when his chain saw "kicked back" and injured his face. The manufacturer had been aware of the product's tendency to encounter "kickback," but failed to design a chain saw with a technically feasible tip guard which would have prevented that phenomenon. The Minnesota Court of Appeals affirmed the Trial Court's dismissal of the punitive damages claim, because the defendant "actively sought ways to prevent dangers associated with its product," and its knowledge of the specific danger "does not provide evidence of malicousness." *Beniek v. Textron, Inc.*, supra at 723.

Assuming, as the Defendants apparently do, that the *Beniek* holding rests entirely on the premise that mere knowledge of danger, coupled with a failure to act, can never give rise to punitive damages, we are not now presented with that circumstance. The Defendants did not merely fail to act, but they continued to market a product which was mislabeled so as to mislead the public into believing that no explosive hazard was presented. We doubt that the Minnesota Courts, which examined the record in *Beniek*, would have reached the same result if the manufacturer of the chain saw had boldly labeled its product as "kickback proof," and then, on the back of that label, had advised, in unobtrusive print, "do not use when a 'kickback' could occur."

In *Gryc*, the Minnesota Supreme Court found that willful indifference consisted of knowingly continuing to market a profitable, but defectively manufactured, product. Here, the evidence suggests that the Defendants continued to press their self-proclaimed advantage in the market, as the purveyor of a safe alternative to the other sellers of explosive inflators, despite their knowledge of its explosiveness, and without due regard to the foreseeable consequences to human health and safety, which was created by their marketing campaign.

In sum, the Plaintiff's *prima facie* evidence demonstrates that the Plaintiff is entitled to plead a claim for punitive damages, leaving to the Jury the propriety for such an award, under the facts of this case, and the Laws of the State of Minnesota. Accordingly, the Plaintiff's Motion is granted.

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Motion to Amend to Add Punitive Damages Claim [Docket No. 30] is GRANTED.

2. That the Plaintiff is directed to file, forthwith, his Amended Complaint, in substantially the form and content as was filed in support of the Motion to Amend, and the

Defendants are directed to serve an Amended Answer in accordance with the governing Rules of Civil Procedure.