Jon and Barbara **BERCZYK**, Plaintiffs,

v.

**EMERSON TOOL COMPANY, a division of Emerson Electric Company, and Emerson Electric Company, and Sears, Roebuck & Company, Defendants.**

Civil No. 02–1335(RHKRLE).

United States District Court,
D. Minnesota.

Sept. 16, 2003.

Krister D. Johnson, Gempeler, Kenyon & Butwinick, St Cloud, MN, Stanley E. Karon, Karon Trial Law, Edina, MN, for plaintiffs.

George W. Flynn, Sonia L. Miller–Van Oort, Flynn, Gaskins & Bennett, Mpls, MN, Paul R. Van Tol, Sean Cleland, Martin, Bacon & Martin, Mt. Clemens, MI, William Laurence Moran, Ricardo Figueroa, Murnane, Conlin, White & Brandt, St Paul, MN, Gregory M. Kopacz, Douglas J. Fryer, Dykema Gossett, Bloomfield Hills, MI, for defendants.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Plaintiffs' Motions to Amend the Complaint, and to Amend the Scheduling Order.

A Hearing on the Motions was conducted on May 22, 2003, at which time, the Plaintiffs appeared by Stanley E. Karon, Esq.; the Defendants Emerson Tool Company, and Emerson Electric Company ("Emerson"), appeared by Paul Van Tol, and Thomas K. Klosowski, Esqs.; and the Defendant Sears, Roebuck & Company ("Sears") appeared by Gregory M. Kopacz, Esq.

For reasons which follow, we deny the Plaintiffs' Motion to Amend the Complaint, and we deny, as moot, the Plaintiffs' Motion to Amend the Scheduling Order.[1]

---

1. On May 14, 2003, in a telephone conference with the parties' counsel, we heard argument on the Plaintiff's informal Motion to extend the discovery deadline to July 1, 2003. At the close of that Hearing, we granted the Motion, and also extended the deadlines for the sub-

## II. *Factual Background*

This is a products liability action, in which the Plaintiffs assert that a Craftsman Radial Arm Saw, Model No. 113.198210, Serial No. 7009.M0891, which was designed and manufactured by Emerson, and sold by Sears, contained design defects which rendered the saw unreasonably dangerous, and which caused injuries to the Plaintiff Jon Berczyk ("Berczyk"). On August 15, 1999, Berczyk sustained a multiple finger amputation to his right hand, while he was using the saw in his basement workshop. The saw was purchased by Berczyk, from Sears, sometime in 1987.

The Plaintiffs contend that the Defendants deliberately disregarded his safety, and the safety of other purchasers of the saw, by failing to equip the saw with a lower blade guard. The saw had a ten-inch blade and, while substantially similar to the twelve-inch blade saw, which was also manufactured, and sold, by the Defendants, the ten-inch saw was not equipped with a lower blade guard, while the Defendants' twelve-inch saw was equipped with a standard, lower blade guard. In the 1970s, the Occupational Safety and Health Administration ("OSHA") mandated a lower blade guard on all radial arm saws that would be used in industrial settings. Nevertheless, the Defendants continued to sell their ten-inch saw, without a lower blade guard, assertedly because it was primarily used in non-industrial settings, but such a guard was available, from the Defendants, as an optional item, at extra expense. In the Owner's Manual, that was provided with Berczyk's saw, the Defendants cautioned users that the optional lower blade guard had the potential of increasing the risk of harm, when the saw was used for some rip positioned cuts, and that the lower blade guard should be employed only on ninety-degree cross cuts.[2]

In 1992, however, the Consumer Products Safety Commission ("CPSC") announced a recall retrofit, in which lower blade guards were issued, by the Defendants, to the owners of the saws. After 1993, the Defendants' saws, including those with ten-inch blades, came equipped with a standard, lower blade guard. The Plaintiffs contend that the Defendants then touted their lower blade guard as enhancing the safety of their saws, even when used during rip cuts. The Plaintiffs further contend that the retrofit lower blade guard is the guard, which was offered as an option at an extra cost, and which the Defendants misrepresented as dangerous for certain cuts. According to the Plaintiffs, the Defendants' acts and omissions were motivated by "corporate greed," and reflected a "callous disregard for the safety of their customers." *Affidavit/Memorandum of Krister D. Johnson* ("Johnson Affidavit"), at pp. 9–10. The Defendants deny the Plaintiffs' contentions.

## III. *Discussion*

As noted, the Plaintiffs seek to add a claim for punitive damages to their Complaint, as well as a claim under the Minnesota Prevention of Consumer Fraud Act ("CFA"), Minnesota Statutes Section 325F.69. We address each of the proposed amendments in turn, commencing with the Plaintiffs' proposed claim for punitive damages.

mission of non- and dispositive Motions accordingly. As a consequence, at the Hearing of May 22, 2003, the Plaintiff acknowledged that his formal Motion to extend the discovery deadline was duplicative of the parties' informal Motion, and conceded that the Motion was moot. We deny the Motion as such.

**2.** As the terms imply, a "rip cut" involves sawing wood along its grain, while a "cross cut" traverses the grain.

**A.** *The Proposed Punitive Damage Claim.*

 1. *Standard of Review.* As we have previously recounted, " '[i]n the Federal Courts of this District, the pleading of punitive damage claims, under causes of actions premised upon the law of the State of Minnesota, must generally conform to the requirements of Minnesota Statutes Sections 549.191 and 549.20.' " *Olson v. Snap Products, Inc.,* 29 F.Supp.2d 1027, 1034 (D.Minn.1998), quoting *Ulrich v. City of Crosby,* 848 F.Supp. 861, 866 (D.Minn. 1994); see also, *Bunker v. Meshbesher,* 147 F.3d 691, 696 (8th Cir.1998). Under Section 549.191, a plaintiff who seeks to assert a punitive damage claim must first obtain leave of the Court to do so, based upon a *prima facie* showing of entitlement. See, *Ulrich v. City of Crosby,* supra at 867. A plaintiff need not demonstrate an entitlement to punitive damages *per se,* but only an entitlement to allege such damages.[3] See, *Olson v. Snap Products, Inc.,* supra at 1034. As the Statute provides, a Court "shall grant a Motion to amend to allege punitive damages if it finds prima facie evidence in support of the motion." *Bunker v. Meshbesher,* supra at 696 [quotations omitted].

In order to establish a claim for punitive damages, a party must show, by clear and convincing evidence, that the Defendant acted with a "deliberate disregard for the rights or safety of others." *Minnesota Statutes Section 549.20, Subdivision 1(a).* The pivotal phrase "deliberate disregard" has been statutorily defined as follows:

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the Defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

*Minnesota Statutes Section 549.20, Subdivision 1(b).*

 In substance, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d 1244, 1256 (8th Cir. 1994). As such, "[a] mere showing of negligence is not sufficient" to sustain a claim of punitive damages. *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 268 (Minn.1992).

 In addition, under the Section 549.20 standard, the Court "is required to search for evidence which is 'clear and convincing.' " *Olson v. Snap Products, Inc.,* supra at 1036. "To be 'clear and convincing,' there must be 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.' " *Ulrich v. City of Crosby,* supra at 868, quoting *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). Ultimately, the Court's independent search for clear and convincing, *prima facie* evidence, that the defendant acted with a deliberate disre-

---

**3.** Under the strictures of Section 549.191, "the Court reviews the evidence in support of a Motion to Amend as the Court would review a Motion for a Directed Verdict * * *." *Ulrich v. City of Crosby,* supra at 867; see also, *Swanlund v. Shimano Indus., Corp., Ltd.,* 459 N.W.2d 151, 154 (Minn.App.1990). Thus, as we have observed in prior cases, in reaching such a determination, the Court makes no credibility rulings, and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof. *Id.*

gard for the rights or safety of others, requires the Court to do more than "rubber stamp" the allegations in the Motion papers. *Id.; Swanlund v. Shimano Indus. Corp., Ltd.,* 459 N.W.2d 151, 154 (Minn.App.1990).

2. *Legal Analysis.* As our Court of Appeals has recognized, the statutory procedures of Sections 549.191, and 549.20, were "enacted to prevent frivolous punitive damages claims by allowing a court to determine first if punitive damages are appropriate." *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* supra at 1255, citing *Bougie v. Sibley Manor, Inc.,* 504 N.W.2d 493, 499 (Minn.App.1993); see also, *Ulrich v. City of Crosby,* 848 F.Supp. 861, 866–67 (D.Minn.1994)("As recognized by our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to address a perceived insurance crisis."), citing *Gobuty v. Kavanagh,* 795 F.Supp. 281, 287 (D.Minn.1992), *Kuehn v. Shelcore,*

*Inc.,* 686 F.Supp. 233, 234 (D.Minn.1988), and *Filz v. Mayo Foundation,* 136 F.R.D. 165, 174 (D.Minn.1991).

▌ As a result, "[a] plaintiff must file a motion seeking punitive damages and **must include** the applicable legal basis and **one or more affidavits** setting forth the factual grounds supporting issuance of punitive damages." *Williamson v. Prasc-iunas,* 661 N.W.2d 645, 653 (Minn.App.2003)[emphasis added], citing *Minnesota Statutes Section 549,191.*[4] "The trial court may not allow an amendment where the motion and supporting affidavits 'do not reasonably allow a conclusion that clear and convincing evidence will establish the defendant acted with willful indifference * * *.' " *Swanlund v. Shimano Indus. Corp., Ltd.,* supra at 154, quoting *McKenzie v. Northern States Power Co.,* 440 N.W.2d 183, 184 (Minn.App. 1989); see also, *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* supra at 1255. Given the language of Section 549.191, and its legislative purpose, we construe the term "must"to impose a mandatory obligation, on a party moving to plead punitive damages, to accompany its Motion with one or more Affidavits.[5]

---

**4.** In pertinent part, Section 549.191 provides as follows:

Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under Sectin 549.20 or other law for awarding punitive damages in the action and **must be accompanied by one or more affidavits** showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages. * * *
[Emphasis supplied].

**5.** As the Minnesota Supreme Court observed, in *State v. Jones,* 234 Minn. 438, 440–41, 48 N.W.2d 662, 663–64 (Minn.1951), citing *Cashman v. Hedberg,* 215 Minn. 463, 472, 10 N.W.2d 388, 389 (Minn.1943):

The word 'may' may be construed to mean 'shall' or 'must,' but only when the interests of the public or their persons require it. The use of the words 'may' and 'shall' is not decisive of whether a statutory provision is directory or mandatory. The word 'must' does not necessitate a mandatory construction. 6 Dunnell, Dig. & Supp. § 8979, and cases cited. The words 'may' and 'must' are used interchangeably. To determine the import thereof, consideration should be given to the subject matter, the language of the statute, the importance of the provisions, the object intended to be achieved, and the legislative intent.
Cf., *Triax Midwest Associates, L.P. v. City of Nashwauk,* 1998 WL 865736 at *2 (Minn.App. Dec. 15, 1998)("Although Minn.Stat. § 238.081 uses 'shall' and 'must,' those words are not necessarily conclusive as to whether the statute is mandatory or director,"and "a factor that weighs heavily in favor of construing a statute as directory is the failure of the

█ Here, the Defendants complain that the Plaintiffs have failed to support their Motion with a competent Affidavit, both procedurally, and substantively. At the outset, we note that Section 549.191 does not specify the precise form that a supportive Affidavit should take, but the structure of an Affidavit is not unique to the pleading of punitive damages. Under the governing Minnesota law, the "clear and convincing" quantum of proof "is implicitly incorporated into the requirement that the movant present a prima facie case of deliberate disregard for the rights or safety of others." *Swanlund v. Shimano Indus. Corp., Ltd.,* supra at 154, citing *McKenzie v. Northern States Power Co.,* supra at 184. Quite plainly, a "prima facie case,"established by "clear and convincing"evidence, requires evidence that is both competent, and probative, that is, the evidence must be admissible. See, *State ex rel. Sime v. Pennebaker,* 215 Minn. 75, 77, 9 N.W.2d 257, 258–59 (Minn.1943)(Affidavit which is not founded upon personal knowledge, and founded upon hearsay "furnishes nothing of evidentiary worth."); cf., *In re Engen,* 2001 WL 910059 at *3 (Minn.App. Aug. 14, 2001) (same); *In re*

*Aiken–Johnson,* 2001 WL 185076 at *2 (Minn.App. Feb. 27, 2001)(same).

█ What the Plaintiffs initially proffered, by way of the Johnson Affidavit, is simply an amalgam of legal argument, rhetorical invective, conclusory surmise, and hearsay stacked upon hearsay. More fundamentally, however, we discern little in the Affidavit which attests to the existence of facts. To be sure, the Affiant, who is the Plaintiffs' attorney, purports that, being "first duly sworn upon oath deposes and states that he is co-counsel,"and that he "makes this Affidavit/Memorandum [6] in Support of Plaintiffs' Motion to Amend the Complaint to allege punitive damages * * *,"but that is the only facts to which he expressly attests. Plainly read, the only competent averment is as to such inconsequential propositions as the identity of the Affiant, and the purpose of the Affidavit. Notably, the Affidavit was not prefaced with any declaration that the Affiant was attesting to the veracity of any other assertion, that is contained in the Affidavit and, if he had, the attestation would have no substantive meaning, as the assertions are simply arguments of fact

statute to declare the consequences of noncompliance."), citing *State v. Jones,* supra; *In re Application of Crown CoCo, Inc.,* 458 N.W.2d 132, 138 (Minn.App.1990).

As to Section 549.191, it would make no sense to require a party to seek leave to amend so as to plead punitive damages, if all that were required of the party would be the conclusory allegations which the Section was enacted to rectify. Moreover, as we note in the text, Section 549.191 has been construed by both Federal and State Courts as precluding a Court from allowing "such a motion where the motion and supporting affidavits do not reasonably allow a conclusion that clear and convincing evidence will establish the defendant acted with willful indifference * * *." *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F.3d 1244, 1255 (8th Cir.1994), citing *Swanlund v. Shimano Indus. Corp., Inc.,* supra at 154. As a result, the Section plainly reflects the negative conse-

quence of noncompliance—namely, that the Motion to Amend the pleading, so as to state a punitive damage claim, will not be allowed. Cf., *Harmon v. Mattson,* 1999 WL 1057236 at *7 (Minn.App., Nov. 23, 1999)(reversing the Trial Court's decision to grant punitive damages because the plaintiffs "failed to submit supporting affidavits when they moved to add punitive damages to their claim * * *."), rev. denied (Minn., January 18, 2000).

6. The integration of an Affidavit and Memorandum of Law, in a single document, underscores the vacuity of the Johnson Affidavit, and also establishes its categorical violation of our Local Rules. Since Motions to Amend are nondispositive in nature, our Local Rules provide that "Affidavits and exhibits *shall not be attached* to the memorandum of law, but shall be filed separately." *D. Minn. LR7.1(a)(2)B.*

and law—and not evidence. We recognize that the Affiant has concluded the Affidavit with the legend "Further your affiant sayeth not,"but that adds nothing to lend probative weight to what are, at best, the grist of pure advocacy.

Beyond averring to the identity of the Affiant, and the purpose of the Affidavit, what the Plaintiffs have submitted in support of their Motion to Amend is devoid of any probative value, and serves as an "Affidavit" by designation, alone. Much of the Affidavit asserts propositions that are mere predictions of what the Plaintiffs intend to prove at Trial. See, *Johnson Affidavit*, at p. 3 ("In summary form, the evidence to be offered at trial will show * * * "); p. 5 ("Plaintiff will offer evidence that it was just a hoax."; "Plaintiff will offer testimony * * * "); p. 6 ("Plaintiff will offer evidence * * * "); p. 7 ("Plaintiff will offer to prove further * * * "). Had the Minnesota Legislature intended to allow punitive damage claims on nothing more than unsupported offers of proof, we are confident that the Legislature would not have insisted upon the submission of competent Affidavits.

Repeatedly, the Affiant presents hearsay testimony, which he summarizes from depositions in unrelated cases, that have not been submitted for the Court's review, or he facilely construes the contents of documents, infused with his robust advocacy, as supplemented by a liberal use of surmise, conjecture, and conclusory comment. See, *Johnson Affidavit*, at p. 6 ("Emerson * * * intentionally chose * * * "); (They knew * * * "); p. 10 ("Defendants spent excessive efforts in defending itself [sic] and callously ignored safety features available that would have prevented accidents—the only basis for such action is corporate greed."). Given its astounding procedural, and substantive inadequacies, we credit no appreciable weight to the Johnson Affidavit.

When, at the time of the Hearing, we advised counsel for the Plaintiffs that the Johnson Affidavit was incompetent, counsel suggested a misunderstanding of the Court's Local Rules, and requested leave to file the documents, which were referenced in the Plaintiffs' submission. According to counsel, he had an "understanding and interpretation of the rules * * * that an affidavit of counsel listing the documents and evidence that has been produced, and summarizing, in part, the deposition testimony of defendants' [sic] employees in prior cases, was acceptable." *Transcript of Motion Hearing of May 22, 2003*, at p. 7 ["T. 7"]. Plaintiffs' counsel then requested leave to submit documents to the Court after the Hearing. [T. 8]. We rejected that proposal, and advised that the Court was "taking the matter as submitted on the record that you folks presented to the court." [T. 9; 53]. Counsel then proposed that, because he had assertedly received some documents only after the Johnson Affidavit had been prepared, he would "simply like to list the documents that we have found after the affidavit."[T. 54]. We responded: "If you want to do that in a letter filed with the court * * * that would be fine." [T. 54].

The mechanism we deliberately chose—namely, of submitting a letter which listed the documents that had been received after the Johnson Affidavit—would allow the Defendants to contest any representation, by the Plaintiffs, that the specific documents were not produced before the Johnson Affidavit was prepared, as the parties have had a continuing disagreement as to when specific documents were produced by the Defendants. [T. 56]. Notwithstanding that arrangement, and without leave of the Court, the Plaintiffs filed a second Affidavit—the Affidavit of Stanley E. Karon ("Karon Affidavit"), after the Hearing, notwithstanding our express rejection of that approach. [T. 53–57]. In offering the Ka-

ron Affidavit, Plaintiffs' counsel represented as follows:

> Your Affiant interpreted Rule LR7.1 not to mandate attaching exhibits referenced in affidavits and considered quoting from said documents sufficient. Your Affiant has been advised that this may not be sufficient and did, at the time of hearing, offer [sic] newly discovered documents to the Court and at what I believe was an invitation of the Court is [sic] writing the Court at this time. It was unclear at the time whether the Court would review the documents to be attached. However, because of the gravity of this issue, it is hoped the Court will do so, giving precedents [sic] to substance over form with respect to bringing of the instant motion.

*Karon Affidavit,* at pp. 1–2.

One would have thought that "the gravity" of the Plaintiffs' interest in seeking an entitlement to plead punitive damages would have counseled the Plaintiffs to abide by the long-established law concerning the procedures, and requisite showings, which would allow them to advance such a claim. Plainly, it has not.

The Karon Affidavit suffers from the same critical shortcomings as did the Johnson Affidavit. The mere designation of a document—in plainly argumentative language—does not convert the submission into a competent evidentiary showing. As was the case with the Johnson Affidavit, the only valid attestation, vouched for by the Karon Affidavit, is the assertion that

the Affiant is "one of counsel for Plaintiffs and makes this Affidavit in support of Plaintiff's Motion to Amend the Complaint against Defendants Emerson and Sears to allege a claim of punitive damages." *Karon Affidavit,* at p. 1. From that point on, the Affiant offers no more than the Affiant's construction of the appended documents, as imbued by his descriptive, and largely unsupported, commentary.[7]

Once again, given the fatal, critical shortcomings of the Karon Affidavit, we extend little probative weight to its content. Nonetheless, we are presented with nineteen exhibits, which were appended to that Affidavit, and which the Plaintiffs exhort us to review, so as not to prejudice their "opportunity to present this matter fully to the Court." *Karon Affidavit,* at p. 5. Notably, the Defendants have not objected to the Karon Affidavit, have not requested an opportunity to respond, and they have not sought leave to submit responsive Affidavits. Although we have grave misgivings about rewarding parties for their counsels' abuse of the Rules, those concerns are dwarfed by our overriding interest in being fully informed. As a result, our attention turns to the Plaintiffs' proffered Exhibits, which we review under the loupe of the clear and convincing evidence standard.

The Plaintiffs' Exhibits are a hodgepodge of largely disconnected documents which, like snapshots of different scenes, foreclose any responsible attempt to see the whole. Memoranda, or correspondence, are offered to suggest that the De-

---

7. The degree of deviation, between the Affiant's summarization of the referenced documents, and the content of the documents, is frequently considerable. As but one example, in the Karon Affidavit, Exhibit 1 is characterized as concluding "that guarding the lower blade would substantially reduce injuries **without inhibiting any significant degree of the intended use of the saw.**" *Karon Affidavit,* at p. 2 [emphasis in original]. In con-

trast, Exhibit 1 reports that "injuries could be reduced substantially if guarding reduced substantially the exposed portion of the sawblade, dado, or molding head without inhibiting to any significant degree the intended use of the saw." An Affidavit is not a work of fiction, its purpose is to convey competent, probative evidence, and not the creative constructs of its author.

fendants had settled upon a lower blade guard which would have prevented Berczyk's injury. We have no means, however, based upon the submitted papers, to ascertain what guard, or guards, are being evaluated, nor are we informed as to whether any Defendant accepted the views of an author of any particular writing.[8] Rather the Plaintiffs encourage us to infer that an effective, and feasible guard, was discovered well before Berczyk's accident, but that, for reasons of "corporate greed," the Defendants "callously disregarded" their customers' safety. If properly founded upon admitted evidence, such advocacy could be effective as a closing argument to a Jury, but we are confronted, here, with an obligation by the moving party to present evidence, and not mere argument. Of course, we are mindful that, with snippets from one document, when appended to another, some apparitions seem vaguely visible, but we must be presented, here, not with nebulous shadows, but with a requisite showing undergirded by clear and convincing evidence.

Understandably, the Plaintiffs complain that, realistically, proof of a deliberate disregard will infrequently be revealed in an inculpatory admission by a defendant. We do not dispute that proposition, and we recognize, as we did at the Hearing on their Motion, that circumstantial showings can serve, as readily as direct admissions, as the predicate for punitive damages. [T. 28–29]. Here, however, the Plaintiffs

would have us read the practical equivalent of "tea leaves" in order to surmise a state of deliberate indifference. It appears, however, that the circumstance confronting the Plaintiffs is largely due to their own pretrial strategies, as they readily concede that, at the time that their Motion papers were filed, they had "not yet taken the first Emerson and/or Sears employee deposition." *Johnson Affidavit*, at p. 13, and 15. Moreover, having treated the culpability for punitive damages as being somehow fungible, the Plaintiffs have made no attempt to focus any specific showing of deliberate disregard as to either of the Defendants.[9]

Moreover, we cannot exclude the potential that the Plaintiffs woefully misunderstood their burdens under Sections 549.191 and .20. We read, with more than passing dismay, their argument as to the proofs, with which they are saddled, in pleading a claim of punitive damages:

> **Plaintiff does not have to provide clear and convincing evidence of willful indifference "at this stage of the proceeding" to amend a complaint alleging punitive damages.** *McKee v. MEPACO, Inc., et al.*, Civ. No. C5–90–78. **The standard is prima facie evidence: "[t]he Court need only determine whether the evidence is sufficient to submit the issue to the jury."** Id.

*Johnson Affidavit*, at p. 14 [emphasis in original].

---

8. With increasing frequency, parties suing corporations employ Rule 30(b)(6), Federal Rules of Civil Procedure, to secure discovery and, potentially admissions, based upon corporate records. We see no such approach here.

9. In the Johnson Affidavit, the Affiant asserts, without any competent support, that "Sears had considerable leverage over Emerson's design configuration and had power to require safety features." *Johnson Affidavit*, at p. 6. In support of this assertion, the Affiant blithely represents that "Sears employee, Conneally[,] was deposed in *Dendy v. Sears* and Emerson case and confirmed that Sears had power over the design and could recommend safety changes to the manufacturer or stop selling and could have actually recalled the product (Conneally Deposition in Dendy pg. 46–47)." If the Plaintiffs held evidence, which they believed demonstrated some collusion between the Defendants, or which showed that both Defendants acted as one, we are amazed that it was never offered, for our review, in a legally cognizable fashion.

Unfortunately, as to the Slip Opinion cited, the Plaintiffs have failed to submit a copy for the Court's independent review. While we hesitate to comment upon a decision of the State Court, as to which we bear great deference, we find nothing in Minnesota law to suggest that the requisite prima facie case, can be predicated on the ethereal showings, that the Plaintiffs advance here, which defy a critical analysis.

We have closely reviewed the documentary evidence that the Plaintiffs submitted for our review, and we are not persuaded that the showings are either clear and convincing, or sufficient to reasonably establish a prima facie showing.[10] We deliberately refrain from a document-by-document assessment of the Plaintiffs' proffered Exhibits,[11] as most do not warrant such attention. Rather, we focus on the Plaintiffs' assertion, that some 300 or more injuries were caused by the absence of a lower blade guard, on a ten-inch radial arm saw, the Plaintiffs' expert opinion evidence, and the occurrence of a CPSC induced recall.

■ With respect to Exhibit 11 to the Karon Affidavit, the Plaintiffs represent that this is a ninety-page listing of radial arm saw claims, or lawsuits, which was produced by Emerson. While the listing of such claims is prodigious, we are unable to determine, with any reliability, which claims are substantially similar to Berczyk's, nor do we have any means of appraising the probability of the occurrence of injuries, consistent with Berczyk's, based upon this Exhibit. Reference is made by the Plaintiffs to various tabulations concerning the amputation of fingers, or other appendages, but we are unable, based on the documents presented, to draw any reasonable inference as to the probability of injury, with anything approaching reliability. We note, for example, that the recall of ten-inch radial arm saws, in 2000, involved some 3.7 million saws. See, *Affidavit of Richard Figueroa, Exhibit 1,* at p. 35. Assuming, without deciding, that over the same time period, there were 300, or thereabouts, injuries, which were somehow attributable to ten-inch radial arm saws, that were manufactured and sold by the Defendants, we are still unable to ascertain the number of injuries which replicate, with substantial similarity, those allegedly sustained by the Plaintiff.[12] See, *Drabik v. Stanley–Bos-*

---

**10.** We reject, outright, the Defendants' effort to discredit the Plaintiffs' attempt at a prima facie showing, based upon the deposition testimony of Berczyk. See, *Emerson's Memorandum,* at p. 10; *Sears' Memorandum,* at p. 11. The Defendants emphasize that Berczyk worked at Sears, was aware of the availability of a lower blade guard before his injury, knew of the dangers presented, and used the saw, even after his injury, without a guard. While these assertions could influence a Jury's apportionment of fault, if any there be, we are obligated to assess the Plaintiffs' prima facie showing on the basis of the Plaintiffs' competent evidence, "and without cross-examination or other challenge." *Swanlund v. Shimano Indus. Corp., Ltd.,* supra at 154; *McKenzie v. Northern States Power Co.,* 440 N.W.2d 183, 184 (Minn.App.1989). Accordingly, we have afforded the Defendants' coun-

tervailing showings, based upon Berczyk's deposition testimony, no weight.

**11.** By and large, the Exhibits are self-authenticating, as they either bear the legend of Emerson, or they otherwise reflect their origin. The Defendants do not assert a foundational objection to any Exhibit, nor do they assert some privilege, trade secret, or other consideration, which would question the facial showing, that the Exhibit is what it purports to be.

**12.** Our effort to find comparable claims has been doubly vexed. First, we have only a generalized description of the manner in which the Plaintiff sustained his injury. Second, the ninety-page tabulation contains cryptic, vague assertions as to others have suffered amputations of fingers, among other injuries,

*titch, Inc.*, 997 F.2d 496, 508 (8th Cir. 1993)("For other accident evidence to be admissible, the proponent of the evidence must show that the facts and circumstances of the other incident are substantially similar to the case at bar."), citing *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1108 (8th Cir.1988).

▮▮▮▮▮ In Exhibit 17, the Plaintiffs proffer the opinion evidence of their expert, Lanny R. Berke ("Berke"). At best, Berke's report is an unsworn letter, which carries little evidentiary weight. See, *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 544 n. 7 (Minn. 2001)("In reaching our conclusions in this case, we did not consider the unsworn letters [from "purported experts"]."). Even apart from its non-evidentiary status, the Berke report does not constitute "clear and convincing" evidence. We apply no *Daubert* gatekeeping function, here, for the Defendants have not challenged Berke's expertise. See, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13] Rather, we simply abide by our obligation to assess Berke's opinions, consistent with the prohibition that we not "rubber stamp"the showings advanced by a moving party. Berke's opinion is rife with concessions that he had been "advised"of certain predicates to his opinion, or that he had an "understanding"as to certain predicate facts. As but one example, Berke opines as follows:

> It is my understanding that the CPSC requires manufacturers of products who believe that their products may be defective and constitute a substantial product hazard, to notify the CPSC of the evidence to which might lead them to that conclusion; and to voluntarily recall its product and provide warnings to owners. It appears from the information available at this time, that Emerson did not contact the CPSC. I am told the CPSC contacted Emerson Electric and Sears and ultimately demanded a recall.

*Karon Affidavit, Exhibit 17,* at p. 3.

While we accept that an expert can rely on evidence that is not otherwise admissible, so long as it is of a type that experts, in the same field would rely upon, see, *Rule 703, Federal Rules Evidence,* we seriously doubt that an engineering, and safety expert, would place great reliance on pure hearsay, and not investigate the matter to his, or her, full satisfaction.

As best as we can discern, Berke's report is predicated on many of the same documents that we found to be an inadequate basis on which to establish a claim of deliberate disregard. We find little to suggest that the inadequacies of those showings can be rectified by the expedient of passing them through a retained expert. See, *In re Potash Antitrust Litigation,* 954

---

which occurred both before, and after, Bercyk's accident. While, as a general proposition, other owners, or users, of a ten-inch radial arm saw sustained amputations to fingers, the means by which that happened, and the condition of the saw, whether with a guard, with the guard removed, with anti-kickback adjustments, or not, defies comprehension. We are not insensitive to the abhorrent injury that Berczyk sustained; an abhorrence which is magnified by each occurrence. The radial arm saw, however, was specifically designed to spin a sharp edge with sufficient velocity to cut through dense materials. If

the number of accidental occurrences, in an of itself, established an entitlement to plead punitive damages, then no one would market step ladders, jack-knives, and the like, or would only do so at a prohibitive price.

**13.** Accordingly, we express no view as to the likelihood that Berke's opinions, as to the proper design of a lower blade guard in a radial arm saw, as to the adequacy of warnings in an Operator's Manual, or as to the obligations of a manufacturer, or seller, to report to the CPSC, or to institute a recall, or retrofit program, will be admissible at Trial.

F.Supp. 1334, 1389 (D.Minn.1997)("With modest exception, the mere passage of an untrustworthy evidentiary showing, through the mechanism of an expert's Report, will be wholly unavailing in curing foundational deficiencies."), aff'd, 203 F.3d 1028 (8th Cir.2000), cert. denied *sub nom., Hahnaman Albrecht, Inc. v. Potash Corp. of Saskatchewan*, 531 U.S. 815, 121 S.Ct. 50, 148 L.Ed.2d 19 (2000), citing *Rule 703, Federal Rules of Evidence.*

Further, we find little in the recall issue which constitutes clear and convincing evidence, such that the Plaintiffs would be warranted to plead a punitive damages claim. Though wholly ignored by the Plaintiffs, the law of the District, insofar as it has been developed to date, imposes no duty upon the manufacturer of a product, to institute a product recall, or retrofit. See, *McDaniel v. Bieffe USA, Inc.*, 35 F.Supp.2d 735, 743 (D.Minn.1999)("While no Minnesota court has addressed this issue directly, this Court is convinced that Minnesota would refuse to impose a duty on manufacturers to recall and/or retrofit a defective product because the overwhelming majority of other jurisdictions have rejected such an obligation."), citing cases. We cannot envision an award of punitive damages for the asserted breach of an underlying duty which does not exist, under the common law, or under any Statute that the Plaintiffs have drawn to our attention.[14]

Lastly, even if we were to reach the legal issues, by assuming that a adequate factual predicate for punitive damages has been properly laid, we have substantial doubt that, under the applicable laws of Minnesota, the Plaintiffs have reasonably established a showing of deliberate disregard. In *Beniek v. Textron, Inc.*, 479 N.W.2d 719 (Minn.App.1992), rev. denied (February 19, 27, 1992), a plaintiff commenced a products liability action against a chain saw manufacturer for injuries suffered when the defendant's chain saw 'kicked back' and injured his face. As detailed by the Court:

> The [plaintiffs'] experts testified that the chain saw was unreasonably dangerous and defective because it was manufactured without a chain break or tip guard safety device. The experts further testified that Homelite knew about chain break and tip guards in 1974, the year the Model 150 chain saw was manufactured. Homelite applied for a patent for a chain break in 1974 and installed tip guards on all chain saws manufactured in and after 1976. Homelite knew about tip guards since 1968. According to [the plaintiffs'] experts, if Homelite equipped the Model 150 chain saw with a tip guard, it would have prevented [the plaintiff's] injuries.

*Id.* at 721–22.

After the close of its case, the defendant moved to dismiss the plaintiffs' punitive damages claim, and the Trial Court direct-

---

**14.** Of course, we do not suggest that the recall, and retrofit program, may not have relevance to the issues to be tried, as we only hold that it bears little weight in the analysis we are obligated to undertake. To the extent that the program is viewed as a subsequent remedial measure, it appears that the precedents on that issue, within this Circuit, have been superseded by the most recent amendment to Rule 407, Federal Rules of Evidence ("When, after an injury or harm allegedly caused by an event, measures are taken that,

if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove * * * a defect in the product, a defect in the product's design, or a need for a warning or instruction."); compare, *Porchia v. Design Equipment Co.*, 113 F.3d 877, 880 and n. 3 (8th Cir.1997); *Burke v. Deere & Co.*, 6 F.3d 497, 506 and n. 11 (8th Cir.1993), cert. denied, 510 U.S. 1115, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994).

ed a Verdict in favor of the defendant on the punitive damages claim, and the plaintiffs took an appeal. The Court of Appeals affirmed the dismissal of the punitive damage claim, reasoning as follows:

The [plaintiffs] failed to present clear and convincing evidence that Homelite's conduct was malicious. Homelite was the first chain saw manufacturer in this country to install a tip guard on all of its chain saws manufactured after 1976. Even though Homelite knew about chain saw kickback in 1968 when it first started research on a safety tip, this fact does not provide evidence of maliciousness. In fact, the evidence shows that Homelite actively sought ways to prevent the dangers associated with its product. Because there was no evidence that demonstrated Homelite acted with a malicious disregard for the rights and safety of others, the trial court properly granted Homelite's motion for a directed verdict.

*Id.* at 793.

We recognize that the record in *Beniek* has distinctions from that presented here. There, no mention is made of the number of prior accidents involving chain saw kickback but, insofar as we are unable, on the Record presented, to determine how many of the prior radial arm saw accidents are substantially similar to Berczyk's, each case represents foreknowledge, by the manufacturer of a motor-driven saw, that a risk of injury was presented by the use of that saw. As the Court made plain, in *Beniek*, that foreknowledge did "not provide evidence of maliciousness." *Id.* Moreover, while the Plaintiffs chide the Defendants for not solving the lower blade design more expeditiously, their evidence does reflect, as a general proposition, that the Defendants were not seeking an effective design.[15] Strangely, notwithstanding the Court's solicitation of the Plaintiffs' views on *Beniek*, the Plaintiffs offered nothing. [T. 24–29].[16]

---

**15.** We have previously distinguished the Court's holding, in *Beniek*, upon a showing that the manufacturer had not only had knowledge of danger, coupled with a failure to act, as was the case in *Beniek*, but "continued to market a product which was mislabeled so as to mislead the public into believing that no explosive hazard was presented." *Olson v. Snap Products, Inc.*, 29 F.Supp.2d 1027, 1039 (D.Minn.1998). We went on to explain that "[w]e doubt[ed] that the Minnesota Courts, which examined the record in Beniek, would have reached the same result if the manufacturer of the chain saw had boldly labeled its product as 'kickback proof,' and then, on the back of that label, had advised, in unobstructive print, do not use when a 'kickback' could occur." The circumstances, which were present in *Olson*, have not been demonstrated here.

**16.** The Court's holding, in *Beniek*, is consistent with the earlier holding in *Wikert v. Northern Sand and Gravel, Inc.*, 402 N.W.2d 178(Minn.App.1987), rev. denied (Minn., May 18, 1987), where the plaintiff had sustained chemical burns from exposure to the defendant's wet concrete, whose dangers were unfamiliar to her. The Trial Court granted the

defendant's Motion for Summary Judgment on the issue of punitive damages, as the Trial Court determined that the plaintiff had failed to show a willful indifference to the rights and safety of others, and an appeal was taken. In affirming the Trial Court, the Minnesota Court of Appeals reasoned as follows:

[F]rom the cases cited above, it appears that something more than mere indifference to the rights and safety of others, such as that which was almost certainly present here, must be present to allow the 'extraordinary' remedy of punitive damages. There must be a maliciousness, an intentional or willful failure to inform or act, before imposing this form of deterrence and extreme punishment. What is objectionable here is not the alleged negligence of respondent in failing to inform the public of possible, if only remote, dangers, but rather the attempt to deny that knowledge of the possibility existed. This post-accident behavior, however, is not sufficient conduct to warrant an award of punitive damages.

*Id.* at 183.

The same may be said, here. We find nothing in the Record presented which reflects mali-

In sum, since the Plaintiffs' Motion papers "do not reasonably allow a conclusion that clear and convincing evidence will establish the defendant[s] acted with [a deliberate disregard], no basis for amendment is made out." *McKenzie v. Northern States Power Co.*, supra at 184. Accordingly, their Motion to Amend is denied.[17]

**B.** *The Plaintiffs' Proposed Minnesota Prevention of Consumer Fraud Act Claim.*

1. *Standard of Review.* Rule 15(a), Federal Rules of Civil Procedure, provides, in pertinent part, as follows:

> [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party and leave shall be freely given when justice so requires.

In construing this Rule, the Supreme Court has observed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reasons—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); see also *Thompson–El v. Jones*, 876 F.2d 66, 67 (8th Cir.1989).

■ While leave to amend should be freely given, such leave should not be afforded where the proposed amendments are futile. See *DeRoche v. All American Bottling Corp.*, 38 F.Supp.2d 1102, 1105 (D.Minn.1998)("Although we begin with a presumption of liberality, an amendment to a pleading can be successfully challenged on grounds of futility if the claims created by the amendment would not withstand a Motion to Dismiss for failure to state a claim upon which relief can be granted"), citing *Humphreys v. Roche Biomedical Laboratories, Inc.*, 990 F.2d 1078, 1082 (8th Cir.1993); *Weimer v. Amen*, 870 F.2d 1400, 1407 (8th Cir.1989); *Holloway v. Dobbs*, 715 F.2d 390, 392–93 (8th Cir.1983); *Norbeck v. Davenport Community Sch. Dist.*, 545 F.2d 63 (8th Cir.1976), cert. denied, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977); see also, *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 935 (8th Cir.2001)("The denial of leave to amend based on futility means that the court found that the amended complaint failed to state a claim * * *."), cert. denied, 536 U.S. 925, 122 S.Ct. 2593, 153 L.Ed.2d 781 (2002). "Accordingly, futility must be assessed in the same manner as a 12(b)(6) motion." *Lumsden v. Ramsey County Community Corrections Dept.*,

---

ciousness on the part of the Defendants. Notably, *Wikert* has served as the law of Minnesota for approximately a decade and one-half, without reported modification, and *Beniek* for a period of over a decade.

**17.** On September 4, 2003, we heard argument on the Defendants' Motions to Compel the Plaintiffs to respond to their belated discovery requests, which principally related to the Plaintiff's proposed claim for punitive damages. At the close of the Hearing, we denied the Motions as untimely—the deadline for dispositive Motions having passed—and, insofar as the Motions related to a potential punitive damage claim, which had not, as yet, been pled, we denied that aspect of the Motion on the basis of relevance, as well. See, *Rule 26(b)(1), Federal Rules of Civil Procedure* ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party * * *."). We memorialize that ruling, and our basis therefore, by this footnote.

2002 WL 31886630 at *1 (D.Minn. Dec. 23, 2002).

2. *Legal Analysis.* Generally, the Consumer Fraud Act does not provide a private right of action to individual consumers. In limited circumstances, however, private remedies may be available to individuals, through the Private Attorney General Act, *Minnesota Statutes Section 8.31.* See, e.g., *Tuttle v. Lorillard Tobacco Co.*, 2003 WL 1571584, *5 (D.Minn., March 3, 2003), citing, *Ly v. Nystrom*, 615 N.W.2d 302, 311. (Minn.2000); *Pecarina v. Tokai Corp.*, 2002 WL 1023153, at *5 (D.Minn. May 20, 2002).

In *Ly v. Nystrom*, the Minnesota Supreme Court held that, under Minnesota Statutes Section 8.31, the Attorney General was provided the authority to seek injunctive relief, and civil penalties, on behalf of the State, "regarding unlawful business practices barred by a variety of statutory prohibitions, including the [CFA]."In addition, the Private AG Statute, Minnesota Statutes Section 8.31, Subdivision 3a, "provide[d] that 'any person injured by a violation' of the laws entrusted to the attorney general to investigate and enforce,"including the CFA, "may recover damages together with costs and attorney fees." *Id.* Thus, the Private AG Statute was the measure that invested authority, in individual consumers, to bring actions under the CFA.

However, the Court also noted that some concern had been raised about the scope of the Private AG Statute, and "particularly as it relate[d] to common law fraud actions and the recovery of attorney fees." *Id.* at 311. In addressing that concern, the Court related that the purpose of the Statute was to "provid[e] incentives to injured parties to enforce the unlawful business practices statutes as a substitute for the attorney general,"as it was "simply impossible for the Attorney General's Office to investigate and prosecute every act

of consumer fraud in th[e] state." *Id.*, citing *Hearing on S.F. 819, S. Comm. Labor and Commerce, 68th Minn. Leg., March 8, 1973* (audiotaped comments of Senator Borden, who was the Senate sponsor of the measure).

The Court also noted that, due to the limited purpose of the Private AG Statute, the Minnesota Courts of Appeal had "expressed reservations about broadening the scope of" the Private AG Statute, and "ha[d] required a showing of public benefit" as a predicate to an award of attorney fees under that Statute. *Id.* In particular, the Court of Appeals had warned that Courts "must take into account the degree to which the public interest is advanced by the suit, * * * otherwise 'every artful counsel could dress up his dog bite case' to come under the attorney's fees statute." *Liess v. Lindemyer*, 354 N.W.2d 556, 558 (Minn.App.1984), quoting, *Boland v. City of Rapid City*, 315 N.W.2d 496, 503 (S.D. 1982); see also, *Behrens v. United Vaccines, Inc.*, 228 F.Supp.2d 965, 969 (D.Minn.2002); *Wexler v. Brothers Entertainment Group*, 457 N.W.2d 218, 222–23 (Minn.App.1990).

The Court recognized that, in determining the proper scope of the authority granted by the Private AG Statute, it had to base its assessment on the fact that the Statute had been originally adopted "as part of the statutory charter for the duties and responsibilities of the attorney general." Since the private litigant would be acting in lieu of the Attorney General, the scope of the Attorney General's roles and duties, would properly define the scope of the private litigant's roles and duties. Under Minnesota Statutes Section 8.01, the Attorney General was to "appear for the state in civil lawsuits 'whenever, in the attorney general's opinion, the interests of the state require it.' " *Id.* Conversely then, the Attorney General, and the private liti-

gant who is acting in the Attorney General's stead, cannot act "to protect private or individual interests independent of the public purpose." *Id.*

In finding a public benefit requirement, the Court reasoned, in part, as follows:

[T]he legislature could not have intended to sweep every private dispute based on fraud, and falling within the CFA, into a statute where attorney fees and additional costs and expenses would be awarded, because to do so would substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence—that each party bears his own attorney fees in the absence of a statutory or contractual exception.

*Id.* at 314.

Ultimately, the Court held that "the Private AG Statute applie[d] only to those claimants who demonstrate that their cause of action benefits the public." *Id.* at 314.

 Here, the Plaintiffs have failed to demonstrate that their proposed cause of action benefits the public and, indeed, they concede that it does not. [T. 25–26].[18] As a consequence, the essence of the Plaintiffs' lawsuit is personal injury, and actions seeking such damages do not benefit the public. See, e.g., *Behrens v. United Vaccines, Inc.*, supra at 971 ("While we understand * * * that there might be some benefit to the public occasioned by their success in this action, we cannot agree that such a metaphysical potential is sufficient to satisfy the public benefit requirement

enunciated in *Ly v. Nystrom.*"); *Pecarina v. Tokai Corp.*, supra at *5 ("Plaintiffs seek damages for past and future medical expenses, pain and suffering, wage loss, and emotional distress,"and "[s]uch damages do not benefit the public.")[internal citation omitted]; *Tuttle v. Lorillard Tobacco Company*, supra at *6. As a result, we find that the Plaintiffs' proposed Consumer Fraud Act claim is futile and, therefore, we deny the Plaintiffs' Motion to Amend in this respect.

THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Motion to Amend the Complaint [Docket No. 37–1] is DENIED.

2. That the Plaintiff's Motion to Amend the Scheduling Order [Docket No. 37–2] is DENIED, as moot.

3. That the Defendants' Motions to Compel [Docket Nos. 58, and 64] are DENIED.

---

**18.** In pertinent part, the exchange between the Court, and counsel for the Plaintiffs, was as follows:

Court: Where is the public benefit under the private attorney general statute here in the state of Minnesota when, according to your own papers, guards are now on all saws. So I don't know that you are looking for injunctive relief.

Mr. Karon: I can summarily respond, you Honor, by stating that if that is a criteria, then the motion to amend to allege a violation of the Minnesota consumer fraud statute should be denied, because there is no such claim here. There can't be. Plaintiff can't because they have already done recalls.

[T. 25–26].